We'll hear the next case on the calendar, Watson v. United States. Good morning, Your Honors. My name is Mark Flessner. I'm a partner at Holland and Knight in Chicago, and I represent the Appellant Cross Appellee, Mr. Devino Watson. No matter how much noise the government has generated in this trial and some of the errors that were made by the District Court, there is one clear fact that is undisputed, and that on May 8th of 2008, the government detained him and spent 1,273 days in detention and then 755 more days following that, depriving him of his constitutional rights. At the time they detained him, how would they know he was a citizen? Because he naturalized as a citizen automatically on September 17th. I asked them whether he was. I said, how would they know? The one and only way they knew would be to apply the law that was applicable at the time, which was that when the last act occurred, which was his father becoming naturalized because he was in the custody of his father and he was a minor under the Childhood Citizen Act, he automatically, automatically, not by anything he needed to do, he didn't need to apply papers, he didn't need to do anything. The only thing— In order to know that, they would have to know who his father is, and I'm sure he told them, but they'd also have to know when the father was naturalized, that when Mr. Watson came to the United States, and they'd have to look into Jamaican law to find out whether he was legitimate. No, they did not have to look into Jamaican law because the law that applied at the time in the matter of Klahar did not require that. Yes, they are required to conduct, and that's part of our negligence claim, to conduct an inquiry into what is the applicable law at the time. At the time he was taken into custody, they couldn't know that he was. I mean, you said— That's incorrect. You say there's only one way. If he had a Certificate of Citizenship, he could have applied for it. That's incorrect. They could have known by looking at his A-file and by reviewing the Certificate of Citizenship of his father, which was given to them by him— They would have to do an investigation, not a big one, I grant you, but they would have to do some investigation to find out that he was a citizen. Six months prior to him being released from the shock incarceration program, he was interviewed by the ICE agent, and that's when the investigation began. So they were doing an investigation. They did not have to wait three and a half more years to make the determination that he was being wrongfully detained or two and a half more years to determine whether or not they should issue his Certificate of Citizenship. Hines came out right around the time that he was detained. Twenty-seven days after. Twenty-seven days after. Yes. Did Hines construe Jamaican law as it was years earlier, or did it observe that Jamaican law had changed? No, it misapplied a prior Jamaican law, and Hines was subsequently reversed and withdrawn. But the law at the time that he was both detained and that he adjusted to citizenship was in the matter of Qahar. No, he was a citizen. Correct. Well, I mean, it's funny you say that because the government's position has been clever times two throughout this entire litigation and is in sharp contrast, by the way, and I encourage you, if you read anything in the record, to read the government's memo of November 25th, 2011, to the BIA. It's the United States' memo. It is basically an explanation as to why he is a citizen and why in the matter of Qahar applies and why Hines does not apply. The other thing you should read, if you're going to read anything in the record, is to read the internal memos which were generated on November 2nd, or just prior to November 2nd of 2011, just prior to him being released from incarceration. Both those memos, the internal memorandum, are in sharp contrast to the position that the government has taken throughout this entire litigation because they are basically our memos. They're basically our briefs as to why he was wrongfully detained and why he was wrongfully denied his certificate of citizenship. Can I ask a question about the application of Hines and making sure I understand your argument? Sure. You say the district court erred by cutting off your damages at twenty-seven days and that they should have said that the Hines decision was not sufficient, the court should have realized, not sufficient to cut off the causal chain. And let's say for the moment that I would agree with you about that at the twenty-seven day period. Wouldn't there be a later period where you would cut off damages, say when the IJ issued a decision saying Hines was controlling? How do you say that the causal chain isn't cut off at that point? Because you can't apply Hines to a United States citizen. Hines never controlled. But in terms of the author, the reasonableness of the custody at that point. The reasonableness standard, it's not, it isn't not whether or not they're acting reasonable. It's whether or not the agents or the IJ or the government, the government is one entity here. We can't divide them up into slices of pie. Whether or not they know the law and they are correctly applying the law. They were not. No one had, no one in the chain of command, the IJ, the BIA, anybody. And indeed it wasn't until you all got involved that this case started to unravel and sort out and that the real truth be known. So none of those, none of those entities had the ability or even jurisdiction to apply the law as they did against a United States citizen. So do we even have jurisdiction? Yes. I'm extending your argument that we shouldn't have jurisdiction. No, you do have jurisdiction over this FTCA matter. If we, if we were to find that the, uh, that the plaintiff's false imprisonment claim accrues on the date that his detention was first subject to legal process, this sort of following up on Judge Livingston's point. What date do you believe, uh, is the date that his detention first became subject to that legal process? There are lots of dates that one could. There are lots of dates. Uh, there's the, you know, uh, I mean, there's in the record, there's May 8th, there's June 25th, the date of the first IJ appearance. There's November 13th, the date of the IJ decision concerning citizenship. Right. Um, there is the date when there is the first, uh, appearance of, of legal counsel, I think. Right. When is that? In 2010? I'm not sure. Yeah, that was, uh, Gibson Dung. I think you appointed him or this Court did. Right. Uh, so how, help, help me think through, uh, when a legal process obtains. Right. The, uh, the, uh, Wallace case and the, the, the Manuel case of the, uh, City of Joliet or Manuel versus the City of Joliet clarifies that of the Supreme Court. Manuel was just handed down, uh, by the Supreme Court a couple of weeks ago that it, Wallace says that, uh, false imprisonment, uh, begins at the date of a release or the date of the first legal process. Manuel said that because, uh, there was a probable cause hearing, you, you understand that in immigration, uh, courts, there's no probable cause hearing. It's just that an agent signs and says, I think this guy is subject to removal and no judicial officer reviews that and so they're automatically detained. Manuel said that there was no meaningful probable cause hearing because the judge relied on false information because the police officers lied to the court and lied in their affidavit and so there could not, so, so there was no legal process. And so it, that Manuel also, the statute of limitations didn't begin until the release. Our theory in this case, uh, Judge, uh, Weinstein got it sort of half right and half wrong, but our theory in this case is the statute of limitation should either begin to run on termination of the removal, uh, proceedings, either of which would be within the statute of limitations. What, uh, uh, and under New York law, uh, the false imprisonment ends at, uh, arraignment, uh, uh, or indictment, whichever comes early. Correct. What would be the analog to arraignment or indictment in the immigration context? Precisely. There is none. Uh, there is none for two reasons. One is that the court never had jurisdiction over United States citizens, so it could be either you or I standing there. Well, then you're, you're really assuming the result, you're, you're, you're saying that a proceeding never begins because you're assuming the result of it. No, I, When it started, they didn't know whether he was a citizen or not. On the objective standard, they should have known, yes, he was a citizen and they should have known that. And they can't, uh, pretend like the law, and that's what the government has done in this case, was so complicated that they're, they're forgiven for not knowing the law. They are expected under general, except for that theory that you've articulated that since he was a citizen, there never could have been any immigration, uh, proceedings. You would agree that the, that there are analogs, uh, to, uh, to, um, arraignment or indictment. Yes, but not in the immigration context. The, the, the NTA is produced. You just said, cause he's a citizen. Let's assume somebody is not a citizen, so he's not a citizen. Yes. What would be the analog to arraignment or indictment in the immigration area? The issuance of the NTA notice to appear, which is signed by not, not by lawyers, lawyers or functionaries in that case are initiated and signed by the proceedings are initiated and signed by, um, agents, ICE agents, and there is no judicial review of that at all. So an agent will look at a file in this case, they looked at the wrong files and mistaken files. Cause there is no analog. There is no analog. And how, how about to arraignment? There's no analog or what would be the analog? I mean, if, if you're, I mean, I'm a criminal guy too. I was with the department for many years and, and I, if you are trying to stretch, although I don't think it, uh, it is perfectly analogous. It would be, uh, the date of the first appearance, uh, before the, before the, uh, IJ. And that in this case is the June 25th, 2008? That is correct. But again, because the IJ didn't even have jurisdiction, that can't be the date. But, well, because the IJ didn't have jurisdiction, it didn't happen. Is, is your position? The, the, I, I, I'm sorry. Because the IJ didn't have jurisdiction because he was a citizen. There were no immigration proceedings really at all. Well, right. Cause, cause an IJ doesn't have a jurisdiction over a citizen. Doesn't an IJ have jurisdiction to decide jurisdiction? We have jurisdiction to decide jurisdiction. We decide there's no jurisdiction and we dismiss, but we have jurisdiction to decide it. An IJ does not, the USCIS decides whether or not a certificate should issue. Uh, but the, uh, IJ does not have jurisdiction to determine whether or not someone is a citizen. Let me ask you this, uh, you know, overcoming for a moment your doubts as to whether there's any jurisdiction at all. Why would we choose the June 25th date as opposed to, let's say, uh, uh, the November 13th date? The November 13th date, there's an actual, uh, decision concerning citizenship. The June 25th date is the date of the first appearance, but nothing, nothing really happened. I was, I was trying, I think, uh, the judge was trying to make an analogy to an initial appearance or arraignment in a criminal context. I'm saying there is no real analogous situation in immigration court. So, but if we're, you know, let's, you know, put that aside for a moment, just bear with us. Sure. Put that aside for a moment. Sure. Um, if you're talking about legal process during detention, let's say that there is, there is a jurisdiction, um, and there is, there is the question of, of, of, of, of when legal, um, process obtains. And so to come back to, there's the, uh, uh, there's a May 8th date, that's the date of detention. There's the June 25th date. Yes. That's the date of the first appearance. Yes. And there's the November 13th date, um . . . 2013. Uh, November 13th date, that's the date of the IJ decision, 2008, right? Yeah. Yeah. Uh, and then it, you know, it continues on to, um, uh, the date of the first, you know, when the lawyer first comes in and is appointed later on because of this court's actions. So what's, what's the question? My question is, which of those dates, just to get, bring you back to an earlier question, which of those dates makes the most sense? If we were to say that, uh, we had jurisdiction, that the, the, the, uh, immigration courts authorities had jurisdiction, which of those dates in terms of legal process makes the most sense for legal process to, to obtain? Well, I, I, you know, I'm not sure I know the answer to that since, uh . . . In other words, what date do you think Watson was first detained pursuant to legal process if you can get past your jurisdictional arguments? I, I think if the question goes to when should the statute of limitations begin, I think it is either, and, and as I've said, and both of those are within the statute of filing, are, uh, may, are, uh, November 2nd of 2011 or, uh, January of 2013 when removal proceedings were, uh, terminated. Legal process in, uh, if, if someone is properly in removal proceedings and is a deportable alien, there is, as I said, there is no analogous situation to a first appearance or arraignment in the criminal context, but if, if you were trying to create an interpretation of law to do that, I would think it would either be the filing of the NTA or the first appearance before the, uh, uh, IJ, IJ, neither of which are applicable in this situation. Let me ask you, let me, if I could go back to the damages, uh . . . Sure. . . . to Judge Jacob's, uh, questions. Uh, you know, here the district court says the plaintiff was entitled to $2,000 per day for loss of liberty, $500 per day for emotional damages, but if you look at our case law, that seems, uh, quite high, doesn't it? I mean, if you look at prior awards in New York State, um, at least provided, you know, the, the awards that the, uh, the government has, has, uh, provided to us, it seems more in the range of $100 to $250 per day of false imprisonment and the federal law caps damages for wrongful conviction, and correct me if I'm wrong, $50,000 per 12-month period for, for plaintiffs with non-capital sentences. No, I, I, the government's chart was, uh, completely skewed. The, the numbers are, in fact, Judge, uh, Weinstein was really on the low middle end of what the numbers are. There is, uh, case law throughout the country on, uh, unconstitutional, uh, incarceration and, uh, going back as far as the, uh, mid-90s, uh, without adjustment for inflation, it was something in excess of a million dollars for every year of unconstitutional incarceration. So, the chart that the government provided was simply misleading. If, if, if I may, uh, what, what analog is there in New York law for your claim of negligent investigation? We never alleged negligent investigation. Uh, that, that's what the government framed it. Ours was... That simplifies life. Okay, okay. I, I'm cognizant of my time here, but I'm happy to stand here all morning if you like. On, on the, uh, issue of, uh, uh, the failure to issue certificate of citizenship negligence claim. Yep. Uh, am I not, I may be missing something, but it seemed that it was approximately 15 months after your client's release that, um, before there was an active N-600 application and that, uh, he received his, his certificate after filing within six months. No. Once they had properly paid a fee and filed a letter for expedited processing in May 2013, he received a certificate within six months. Am I missing something? Please... Uh, number one, uh, my colleague sitting to my left here with the National American Justice Center was involved in that time. Uh, they filed a, this is another noise by the government, they filed a petition to, uh, for fee waiver and that was properly granted. So that, that is, uh, not an issue that, uh, he applied twice while he was detained for a certificate, uh, for his N-600, which was denied. Then Mr. Fleming from the, uh, National American Justice Center filed and that document, the removal proceedings, uh, were terminated, which it did not need to do to because, uh, need to do, uh, because under the act, USCIS has a duty to, uh, to match the negligence, has a duty to issue the certificate upon, uh, all oblig, all, uh, requirements being met, which it knew and that's why I'm, uh, asking you to look at the memos from November of 20, uh, 2008, which shows that USCIS and all agencies knew that, that he was a citizen at the time. So, it, it is not failure to investigate or negligent investigation, it's failure to follow the duty, which it, uh, USCIS had a duty to issue once they determined that it was a, that he was a citizen and they determined that in a, in 11. He didn't seem to be in a hurry to get the certificate of citizenship, uh, if as you point out, he was a citizen from 2002. He was a child. How old? Uh, when he adjusted, he was 17 and, um, he was born in 84, so however old he was in 2008, but he was a child. Thank you. All right, you're welcome. Thank you. Good morning. May it please the court. My name is Joseph Martolo. I'm an assistant U.S. attorney with the Eastern District of New York here on behalf of the United States. Uh, as, uh, cross appellant, we also ask for a rebuttal time of three minutes. Uh, Your Honor. Yes. I hope to discuss this morning, first, why plaintiff's false imprisonment claim is time barred. Second, why plaintiff's false imprisonment claim is not subject to equitable tolling. And finally, why in the alternative, the district courts, uh, did not clearly err in limiting plaintiff's damages the first 27 days of, uh, the plaintiff's ICE detention. You, you'll have certainly time to make all those arguments, but let me first begin by how, uh, with some questions about how this case was handled. And correct me where, where I'm, I'm off. When Watson was initially interviewed by the ICE, by the ICE, uh, officer, Eric Andron, Watson told Andron the correct names and contact information for his father and stepmother. Also said that he was a citizen. Why didn't Andron ensure contact with them before making a determination about Watson's citizenship? I mean, the files for the individuals Andron identified as Watson's parents were clearly incorrect, clearly incorrect. Those individuals had different names. The male was unmarried and the female, um, obtained her married name, Watson from a deceased ex-husband. I'm at a loss to understand, uh, how the government, how the, how ICE proceeded in this case, given what Watson had told him, uh, from the start. That would have, I think certainly would have, uh, just easily, uh, could have avoided a lot of what's, what's, what's, what's problematic in this case. Well, the government did indeed obtain the, uh, file for the wrong Hopeton Watson from Jamaica in the beginning of this case.  Uh, the plaintiff's relationship to Hopeton Watson. Um, the pre Heinz detention, however, has no bearing on the remainder of the plaintiff's detention here after June 4th, 2008. Isn't it true that among the documents that Andron, Andron had when investigating Watson citizenship was Watson's pre-sentence investigation fact sheet. That document, uh, that's in the appendix 254 and 256, clearly identifies Watson's citizenship. It identified that Watson lived with his parents, provided their names, addresses, and phone number. Why didn't ICE make contact with him, uh, before ever initially, before beginning, uh, the, uh, initial removing this, uh, proceedings? There, there's no evidence. Wouldn't it have been obvious? Wouldn't it have been obvious? Uh, wouldn't that have been obviously the first action to take if there were doubts about Watson's citizenship? It seems like, in other words, the stuff that was the most obvious thing to do wasn't done. And I'm trying to understand why. Well, there's no evidence in the record as to whether or not officer Andron did contact the parents. But even assuming he did contact, uh, plaintiff's actual, uh, father and stepmother, Claire Watson, that does not end the analysis. The plaintiff would still need to show that he meets all of the prerequisites under, uh, the statute. And here, uh. So how can he find, and then what happens is he, the, the, the, the, he gets the files that are clearly incorrect. They, they get the files that, of the wrong Hopeton Watson from Jamaica. And after, uh, uh, within, uh, and by the way, it is plaintiff's burden here as a foreign born individual facing derivative citizenship to show that he is in fact a U.S. citizen. The government. He said his parents, he said his, he gave the correct name of his, of his, of his, of his, of his father and stepmother. He said that he was a citizen. What more was he supposed to do on the, under that circumstance? If the government could easily have accessed that information, if it had Watson's pre-sentence investigation fact sheet. The pre-sentence investigation fact sheet is, is, is, is not sufficient in and of itself. The plaintiff here could have, for instance, uh, provided Hopeton Ulando Watson's certificate of naturalization. He doesn't do that until July of 2008. Uh, and by that point, Heinz has already been, uh, issued and under Heinz, even with the correct naturalization document, that's not sufficient. But the plaintiff also needed to show under, uh, 1431A and 1101C1 that the plaintiff, uh, had to establish as the BIA noted, and as this court noted, that he was in his father's legal custody at the time of his legitimation. That's the date that the birth certificate was signed. Here, Hopeton Watson, uh, who was living in, uh, New York at the time, uh, uh, of this legitimation in, in, in 1991, uh, came down to Jamaica, signed it seven years later, and that investigation was only uncovered during the course of his removal proceedings. The government had an obligation here considering that, uh, the plaintiff was convicted of two serious felonies. Uh, he was not born in the United States, and as a result, they, uh, conducted an investigation. And then under Heinz, that becomes the intervening cause, and as, uh, the court pointed out, uh, the intervening cause here breaks the, is, is the causal chain is cut off. As Heinz, is, is Heinz based on a change in Jamaican law going forward as to what constitutes legitimation, or did Heinz say that the law was always, that they, that, you know, the BIA has always been wrong about this, and, uh, there's now, uh, we now realize that Jamaican law is different. They, they said that basically that Jamaican law is different. It overruled matter of Clayhar, which had been the operative. Overruled it, meaning, but did it overrule it because Jamaican law changed, or did it overrule it because Clayhar was wrong? Because Clayhar was wrong. And the- Because now we know Clayhar was right. Well, Your Honor- It would be nice to get this straight. Well, as, as this court has noted, uh, there are legal and factual complexities involved in addressing claims of derivative citizenship. And as Your Honor pointed out, this is not something that was just immediately known to the government in 2008. I mean, Jamaica uses, uh, English as, it's a, it's an anglophone country. I, I don't know why we can't figure out what the law is there. Well, at, at this time, Your Honor, the, um, when, when Hines was issued, it, it ordered that plaintiffs needed to be married. I'm sorry, parents need to be married in order for a child to be legitimated under Jamaican law. And under that, uh, framework, the government reasonably relied on Hines, uh, to find that the plaintiff was, in fact, not a U.S. citizen. At the same time before Hines, if he had sought a certificate of citizenship, it would have been granted to him, correct? Not necessarily, because he still needed to meet the prerequisites under 1101C and, and 1431A. But assuming that, I mean, there, there would be nothing in Jamaican law that would, would have been an impediment. He would have gotten the certificate of citizenship before Hines was issued. Well, that, that's, uh, that's true, assuming that. However, this court, uh, noted in its July 9th, 2009 decision, um, uh, addressing this issue of legitimation, um, and whether or not the biological father had custody of him at the time of legitimation. And even in the court's most recent decision in May of 2011, one of the issues that the court, uh, requested that, uh, the BIA address is whether or not, uh, derivative, whether or not, um, this custody issue bear, would, would bear on the merits of plaintiff's case. Following up on some questions asked by the Chief Judge, I, uh, I mean, I do understand why you wouldn't rely entirely on a phone number that somebody gives you. If somebody wants to be a bank teller and says, you know, here's the phone number of my former employer, call up and the sister answers the phone, that's not reliable. But not to make the call in the first place when you say, this is, this is my father and this is the link that I have to, to legitimation and to citizenship seems very odd. And I don't see anything in the record indicating that even called that number. That's correct. There is nothing in the record as to whether he called that number, the, the, what the officer did was, uh, that he obtained the wrong Hopeton Watson file from Jamaica. Is Hopeton a common name in Jamaica? Your Honor, it appears that there are two Hopeton Watsons from Jamaica. The Hopeton Watson file we received was from an individual living in Connecticut at approximately the same age as would be the plaintiff's father. And was the middle name given in that, in that, uh, uh, uh, for that Hopeton Watson? Well, Your Honor, it ultimately was determined that it was a man named Hopeton Livingston Watson that was obtained, uh, and the actual name of plaintiff's biological father is Hopeton Yolanda Watson. Um, but it would seem to be two different people. It is. There's no dispute, Your Honor, that there's a different file, but that doesn't change the fact that once Heinz came out, that chain of causation was cut off. Let's, let's, let's, let's go, let's, let's think about Heinz a little more if we can. Uh, November 11th, right? You've got a brief, a November, uh, November, rather, I should say November, 2000 brief. This is on a 20, a four 24 appendix. I read that to say that DHS concedes in its November, 2011 brief that the interpretation of the law in effect, and that's the key, the law in effect was matter of Klohear. And so Klohear not matter of Heinz controlled, uh, Watson's derivative citizenship obtained in, in September, 2002. Well, Your Honor, that November, 2011 memo from, uh, ICE ultimately recommended that it was possible that the plaintiff derived us citizenship when the BIA ultimately made his decision here in, uh, uh, 2013, that final decision did not say that Klohear should have applied. It did not adopt that, that argument. Well, the BIA in matter of Heinz expressly stated that it applied only to, and I quote in future cases in future cases and that the BIA, and I quote, we'll hear it after deem a child born out of wedlock, close quote, language emphasizing the absence of a retroactive application of, of, uh, in this case. Um, and DHS seemed to agree in its brief before the BIA in November, 2011. So, uh, it, it would seem that under, uh, just looking at, uh, uh, the government's own prior submissions that the government's reliance on matter of Heinz was clearly mistaken as a matter of law. That's not correct, Your Honor. And, uh, first, just with respect to your first point in Heinz itself, the BIA applied its 2008 interpretation to Heinz his mother who naturalized in 1991. So it was looking backwards in, in, in Heinz, but regardless, in the initial Watson decisions in this case, uh, the briefs before the second circuit and, uh, the briefs throughout the immigration removal proceedings, the government argued that Heinz was correct and that they were bound to follow Heinz. This later decision was later argument made by ice was ultimately not adopted by the BIA. Could you address the statute of limitations argument? Uh, yes, Your Honor. Um, with respect to the statute of limitations, uh, regardless of whether or not legal under Wallace V. Cato, regardless of whether the legal process accrued on May 8th, when the plaintiff was detained May 27th, 2008, when the plaintiff was, when the NTA was filed June 25th, 2008, when the plaintiff first appeared before an IJ or even, uh, as we've judged Katzman mentioned the November 3rd, 2008, eight BIA decision. Uh, any of those decisions, uh, would render the plaintiff's claim time barred here. Uh, all of those decisions, you know, assuming any of them or is when legal process, uh, uh, accumulates, all of those decisions would render the claim time barred. Why shouldn't equitable tolling apply? Equitable tolling should not apply Your Honor because the plaintiff did not diligently pursue his rights and there were no extraordinary circumstances that stood in his way. Why isn't the confused state of the law regarding Heinz and the, the whole question of derivative citizenship in this case, in extraordinary circumstance? Well, because Your Honor, the confusion of the law here would ultimately, uh, if that's permitted, that would ultimately swallow the rule because no one prevented the plaintiff from filing anything or tricking him into doing anything that he didn't do. The judge, Judge Weinstein, at the district court level found the plaintiff to be exceedingly clever and intelligent. Uh, and this is, this, the mere ignorance of the law has not been shown to be enough to entitle a plaintiff to the extraordinarily rare remedy of equitable tolling. But however clever he might be, he's not a lawyer and he's, uh, uh, been repeatedly, uh, ignored when he says that, uh, you know, just ask my, just check with my father and you'll see his citizenship. Everything he's been told by the government, uh, suggests that, uh, he, he doesn't have a case. Well, Your Honor, and in other words, I think that a lot of this is just a self inflicted wound by the government. They could have just easily dealt with this case. We wouldn't be here just by simply checking at the outset, uh, as to whether, uh, you know, who, who the father was, whether there was anything there. I mean, we've gone through all these proceedings and it's, it's, it's really is a waste of judicial resources that could have been avoided. Well, Your Honor, to your last point again, uh, there, there's no dispute about the wrong file, but Heinz still acts as a intervening, uh, uh, break in the chain of causation and ultimately the government is not, uh, responsible for, for following, uh, what was the legal precedent. The issue is whether it's a break in the chain of causation or whether it constitutes an extraordinary circumstance that might conceivably justify tolling. I don't know whether it does or doesn't, but you'll have to admit this is no way to run a railroad. Well, Your Honor, we would note that there's no evidence in the record that the plaintiff was so preoccupied with his removal proceedings, uh, that he was not able to then, uh, file an administrative claim. And he was, all of that was actually the same, same investigation, the same gathering of documents, the same testimony that he would use to establish the citizenship as well. Right. And he also had Gibson Dunn attorneys helping him. And it took years after the Gibson Dunn attorneys were involved, uh, to, uh, ultimately to file any administrative claim. And Your Honor. Gibson Dunn wasn't involved for some time, correct? They were involved, uh, uh. This was after the court appointed a counsel, isn't that correct? They were, that's correct. They, they were. How long was that? In July of 2010, Your Honor. By that point, when did his proceedings begin? His proceedings began May 8th, 2008 when he was detained. Okay. So it's more than two years and you're trying to, it's about two years. Well, Your Honor, I. That's not, that's not in your, your view, uh, uh, a, uh, quite a lot, amount of time. Well, Your Honor, I, I think the key is that even, uh, with the Gibson Dunn attorneys, he still did not file an, uh, his administrative claim until 2013, until three years later. This was not someone who, uh. Thank God for appointed counsel. Well, Your Honor, ultimately the fact that the plaintiff was not, was confused about the law here is not sufficient to be an extraordinary circumstance that, that stood in his way. Uh, it, you know, otherwise, uh, other individuals who are, uh, claiming false imprisonment who may be involved in very serious, uh, and complicated issues would always just argue equitable tolling if there's a timeliness issue. The government is taking the position that while he was imprisoned, Hines made it reasonable, the government acted reasonably during this period in relying on Hines. Uh, and you're, at the same time, he's supposed to pursue an FTCA claim that would have been futile because of Hines. Well, Your Honor, as Wallace points out, I, I don't think it would have been futile because under Wallace, he could have filed the claim, the district court would have then stayed the proceedings. He lost it. I'm sorry? He just would have lost it according to your position. I don't think so because I think the court, the, the civil case would have been stayed pending the outcome of his immigration proceedings. I don't think he just gets a, uh, you know, a free pass to just wait until everything is resolved. Otherwise, there'd be, uh, ultimate, ultimately confusion. And Your Honor, again, we reserve our rebuttal. We wouldn't want any confusion. It certainly would have been helpful for him to have, uh, you as the government because you would have provided him with something different than what he had been, was being told by the government at the time. Thank you, Your Honor. Well argued. I'm just, it's a hard case. No, no, it's very well argued. Please. I'm not sure how much more you want to hear from me, but, uh, just a couple of points, which are that, uh, the vested citizenship rule is decades old. It's, it's law in, uh, this circuit, Ashton v. Gonzalez, uh, and it's law under Klohear. Hines did nothing, nothing, didn't even address or did nothing to, and could not, the BAA could not in a decision affect the vested citizenship rule. Uh, the other thing about the, um, uh, the agents when they were, uh, conducting their investigation and, and, and got the wrong files is that there were specific ICE directives, four of which were issued during his detention, one of which was issued only days after his initial detention, which said if there, there is a claim of citizenship for a detained, uh, individual, that there, there, these specific, uh, uh, procedures need to be followed within 24 hours, 24 hours. Had they done that, we would all not be here enjoying ourselves like this. Agent Andron or no one else did any of that. Well, there, there, there may have, may be a, a breach of that, but New York law doesn't have an analog, uh, with a, a freestanding, uh, duty to abide by regulations. If there is a, if there's a duty to, uh, uh, to abide by their own internal, uh, internal procedures and they fail to do that, there is an analog for that. McGowan may, would seem to say otherwise, but I, I have to look at it. Okay. I, again, we can look at the, the case law on that, but I'm pretty certain on that. The other thing I, I, I just want to point out, which is that, and, and Mr. Marottolo just said that, that, uh, this, uh, uh, 11th grade educated young man in July, two months after he had been detained, which he ultimately was detained for three more years, he produced his father's, uh, certificate of citizenship. They put that in the file. They did nothing as a result of that. That is just complete negligence. Is that because they thought somebody else was his father because he had the, the other Hopeton, Watson? They, once they saw his correct certificate of citizenship and his correct name would, would have been a pretty good clue that they had, were relying on the wrong file. They did nothing to investigate that or correct that or make the phone call as you pointed out. Um, again, I encourage you to read the memo, the BIA or the, the government filed with the BIA in November of 2011 and the internal memos that led up to the, uh, to the, or the plaintiff, I'm sorry, the plaintiff's release. They're very telling about the government's position in this case, and they're completely inconsistent with the position the government is currently taking. Um. On the, uh, uh, continuing emotional damages, uh, issue, uh, uh, Judge Weinstein concluded that, uh, your client was not a credible witness, that there were many dishonesties in his testimony. It was in that regard that, uh, he talked about how clever Mr. Watson was. Um, why should we, uh, what was clearly erroneous, uh, about the district court's, uh, findings in, in, in, with regard to continuing emotional damages? Because there is a difference between, uh, I, I'm not sure what was going on with Judge Weinstein when it came to that, uh, that part of the case. It came sort of out of the blue, out of nowhere. But, uh, we did not file, uh, for damages for loss of income, uh, subsequent to being released. The, the witnesses, both the government witness and our witness, uh, expert witnesses, all agreed that there were continuing emotional damages, that he was depressed based on his, uh, his incarceration. Judge Weinstein found that there, there could not, and, and the experts even said this, that if it's, if it's confined to 27 days, we can't find that his depression that is happening subsequent to his incarceration is based on what happened in the first 27 days. That, that's sort of the house of cards that falls apart based on this artificial, uh, connivance that Judge Weinstein, uh, found. So, but the three witnesses, his family members and the two expert witnesses all found that he had, uh, can, uh, found, testified to his depression, his moods, his, the trouble he was having adjusting to, uh, post-incarceration, the trauma he was having by the fact that he didn't have a certificate of, or a certificate of citizenship, and, and that he was still subject to removal, and he didn't know. How would anyone know which incarceration caused the depression? He, he was, he had been in jail before this. I think the testimony was that, uh, because he was in a non-violent, uh, uh, drug offender, that, uh, that, uh, his testimony was that, that shock incarceration program, you put him on a new track, he was ready to get going, he wanted to contribute. Shocking. It, it shocked him. Right, exactly. It shocked him. It worked. Um, uh, and finally, and I won't belabor this, that, um, uh, Hines is, is not a break, uh, in the, uh, causal chain because the incarceration began, uh, uh, uh, the, the causal chain began, or the, the incarceration began on May 8th. Hines didn't happen until a month later. And so there is only one allegation of false imprisonment, and that started, uh, on, on May 8th. It goes all the way through. We can't say that, that each day of incarceration is a separate, is a separate tort. The, the, the incarceration that occurred after Hines was caused by the, by the incarceration that, that occurred prior to Hines. So the government is foolhardy to be relying on that. Thank you. We thank you both for your arguments. Uh, oh, I'm sorry, you have, uh, three minutes in, uh, cross. Thank you, Your Honor. Just a, just a few, uh, brief points. Uh, first, uh, the plaintiff's attorney argued that Judge Weinstein's finding that the plaintiff was a non-incredible witness who repeatedly lied on the stand and deliberately lied here was out of the blue. That's obviously not true. The, Judge Weinstein watched the plaintiff, uh, testify at the equitable tolling hearing, at a liability hearing, at a damages trial. The plaintiff admitted to lying on three occasions. He was impeached with prior and consistent testimony on 17 occasions. Um, and he had, uh, the, the judge found that his credibility was so important here because the plaintiff had no medical expenses. He had not sought any mental health, uh, for emotional distress. So really it was based on his own language and the judge, again, found him to be totally, uh, not credible. He said that he didn't start using cocaine until after his release from ICE detention. But he had, he had actually been convicted of attempted sale of cocaine in 2007. Yes, and he lied, Your Honor, about whether he pled guilty to certain crimes. He lied about his, uh, drug history and about, uh, other issues related to his criminal background. And as, um, uh, the court noted, uh, the plaintiff has been in custody, uh, previously. So, uh, he testified, uh, about feeling unable to enter a room because of his stay at Rikers Island. And that was a cause of his depression. Totally irrelevant from our case. Uh, additionally, Your Honor, uh, the, the law that was in a, with respect to the plaintiff's vested citizenship argument, uh, the law that's in effect, it refers to the, the statute, not the case law. There, there's no support, uh, for that, uh, by the plaintiffs. It, it's the statute that's at issue. And with respect to the negligent. What about Thorpe? Thorpe v. Housing Authority, 1969 Supreme Court case. Well, Your Honor. Supreme Court says the law, in effect, I'm, I want to quote, encompasses constitutional statutory and judicial changes to the law, as well as changes made by any administer, by an administrative agency acting pursuant to legislative authorization. Well, Your Honor, this court, when it looked at this case, did not question whether Hines applied. It just analyzed the reasoning of Hines. In other words, there was no issue about, uh, whether Hines was retroactively applied when this court looked at this case. This court suggested that Hines may have been misapplied to the statute. The statute, 1101C and 1431, remain in effect. And further, with respect to the negligent investigation claim, uh, there is no private analog under New York law. And in fact, McGowan says exactly that. New York tort law does not recognize a freestanding duty to abide by private regulations. The plaintiff refers to a variety of, of, uh, names for his negligence claim. But ultimately, it's rooted in, uh, this, uh, failure to comply with directives. If there was a negligent investigation claim, and I, and, uh, I have to look again. But if, if there was, would it be timely? No, because the negligence claim would have accrued at the time that he was detained. When he knew of the wrong that was afflicted. There's no doubt that the plaintiff knew that he was a citizen. He's said it multiple times. Plaintiff's counsel's indicated it. He knew he was harmed at that point. And thus, even the negligence claim would be time barred. That would, that would be, you're saying May 8, 08? At minimum, but even if you take the date. Minimum? Well, at the, the BIA, I'm sorry, at, at the earliest would be May 8, 2008. But even if you take the BIA date that Judge Katzman mentioned earlier, when they issued their decision, that would still be time barred. That would be November 13, 08. That's correct, Your Honor. Thank you, Your Honor. Thank you. Uh, thank you, thank you both for your, um, excellent, uh, vigorous advocacy. Well argued. Well argued. This is a case that was not of your making. We appreciate your, uh, your fine arguments. Thank you.